FARMER, J.,
dissenting.
Susan Special became pregnant as she was nearing her fortieth year. The fetus *687 presented breech, and her doctors proceeded with a caesarian section at 35 weeks. Dr. Baux applied spinal anesthesia. A moment after they removed the placenta, she became unresponsive. Her blood pressure fell precipitately as she went into cardiopulmonary arrest. Calling a code blue, Dr. Baux and hospital staff attempted to revive her. She was temporarily resuscitated and transferred to ICU where another arrest occurred. Susan died five hours after the delivery.
Her Estate sued Dr. Baux[1] and West Boca Hospital for negligence. The claim is that Dr. Baux and the Hospital were negligent in administering anesthesia, in monitoring her system and controlling her fluids during surgery, and in responding to her cardiopulmonary arrests. Defendants denied the allegations, alleging instead that Susan’s death was caused by amniotic fluid embolus (AFE), an allergic reaction from mother’s blood intermingling with amniotic fluid, sometimes causing heart-lung collapse.
At trial the AFE diagnosis figured prominently. Plaintiff called the Chief Medical Examiner performing the autopsy, who testified she found no evidence of AFE in Susan’s body. Plaintiffs expert testified that Susan died because of the above alleged departures from the standard of care. Plaintiff later questia West Boca staff physician, Dr. Adelman, as to the facts leading to the AFE diagnosis of Susan, the number of AFE cases seen at that Hospital, and to contrast the prevailing statistics about the incidence of AFE. He testified to figures suggesting the diagnosis of AFE at this Hospital was about 15 times the rate elsewhere.
The defense called Dr. Dildy as their expert. He opined that Susan died from AFE. On cross examination, plaintiff elicited from him that that the probability of AFE is usually 1/20,000, but ranges from 1/8,000 to 1/80,000. Plaintiff then tried to begin a line of cross examination of Dr. Dildy about the reliability of the Adelman diagnosis that AFE had actually occurred in Susan and the unusually high incidence of it in West Boca Hospital.
Defendants’ objection on relevancy grounds was sustained. The court held that plaintiff could inquire only about the statistical occurrence of AFE and could not question Dr. Dildy using the substance of Dr. Adelman’s testimony and its reliability to explore the trustworthiness of defendants’ diagnosis of AFE. The court concluded that doing so would amount to improper collateral impeachment.
Again, the principal dispute at trial was the cause of Susan’s death. In response to plaintiffs claims of negligence, defendants alleged that regardless of their handling of the emergency from cardiopulmonary arrest, it was AFE that caused her death. The presence of AFE was thus the essential issue.
Our Evidence Code requires the admission of relevant evidence except when explicitly excluded by law.[2] The Code defines relevant evidence as “evidence tending to prove or disprove a material fact.”[3] The Code also provides that expert witnesses shall be required to disclose facts or data underlying their opinions.[4] A party may attack the credibility *688 of any witness by testimony from another witness that material facts are not as professed by the witness being impeached.[5]
In this case, the trial judge accepted defendants’ contention that this entire field of proposed cross examination would have been collateral to the issue on trial. Characterizing evidence as collateral is simply another way of saying it is not pertinent, hence irrelevant. The primary test as to whether evidence would be collateral is to consider whether the same evidence could be admitted for another purpose than the inconsistency.[6] If it could be thus admitted, it is obviously relevant and not collateral.
The object of the proposed cross examination of the defense expert was to elicit answers leading to proof of the cause of death, the crux of the lawsuit. Had plaintiff called Dr. Dildy as his own witness, doubtlessly he could have questioned him directly on the same line of inquiry to which defendants objected on cross examination. The results of an exploration of his knowledge and related opinions as to any medically reliable evidence of AFE in Susan, the frequency of AFE elsewhere and its claimed presence more frequently at this Hospital, surely could have led directly to proof illuminating the cause of the death of Susan in childbirth.
Barring an entire line of cross examination of one’s expert witness about facts and opinions directly relating to the vital issue in the trial requires on review that we indulge the possibility that, if allowed, answers and concessions could have yielded impeachment of all or part of opinions expressed by opposing witnesses. Achieving recognition from Dr. Dildy as to anomalies or errors in Dr. Adelman’s diagnosis by a probing line of inquiry could have a significant effect on the jury — namely, that the believable facts about the cause of death may not have been those opined or relied upon by Dr. Adelman and Dr. Dildy.
Because the subject is as relevant and probative as evidence can be on the fundamental dispute between the parties, the Evidence Code afforded the trial judge no discretion to bar it ab initio on the basis it involved collateral matters.[7] At the very outset of the inquiry it is simply not possible to hold this entire line of cross examination collateral or prejudicial. And the conceivable probative force of this subject of inquiry makes it very unlikely that the exclusion of the entire area of cross examination was harmless.
Neither can the objection be justified by the rationale (as the trial judge later posited when he revisited the issue) that answers yielded by such a cross examination would inevitably result in unfair prejudice outweighing any probative value.[8] Evidence that in reality is misleading, confusing, duplicative or unfairly prejudicial, *689 though having some relevancy, is deemed unreliable by § 90.403 as a matter of law.[9] But this provision is not a general grant of authority to trial judges to bar evidence adversely affecting a party’s position at trial; it bars evidence only when it genuinely has the statute’s elements of legal unreliability. It is thus critical to grasp the sort of unfair prejudice required by § 90.403.[10]
For some issues, as here, an application of widely accepted scientific principles to a particular set of facts can be fairly debated by even those most knowledgeable on the subject. It is the very purpose of inquiry of scientists to have them explain the analysis underlying their opinions in the case, i.e. their scientific methodology.[11] Of necessity this includes an exploration and application of scientific principles to the pertinent facts and theories on which each relied to reach an opinion.[12]
The purpose here was to provide expert testimony to “assist the trier of fact in understanding the evidence in determining” the scientific reliability of an AFE diagnosis.[13] This was the core relevant evidence in this trial. Answers relating to the cause of death simply cannot be legally brushed aside as unfairly prejudicial to the defendants or their expert witness. Nothing in the record presents any basis to conclude that the proposed line of inquiry would have categorically produced only inflammatory, bewildering or unreasonably duplicative evidence, the only grounds authorized by § 90.403.
In our adversary system of civil litigation, the clash of experts is as much a part of trials as the very conflict of the parties themselves. But there can be no “battle of the experts” on an obscure scientific subject if the trial judge bars the parties from ever testing the other’s opinions by the traditional forensic methodology of pertinent questioning. In fact the nature of scientific inquiry itself is rooted in attempting to disprove theories by incisive questions.[14] Asking an expert on a scientific subject questions designed to disprove a theory is only duplicating what the expert was required by scientific custom to do in forming the opinion. An inquiry revealing contrary opinions between qualified experts relevant to the dispute simply does not lead to unfair prejudice within the meaning of § 90.403.
*690 Moreover, any prospect of unfair prejudice actually resulting from such a relevant inquiry of a science expert could no more be ascertained at the outset than could the actual answers produced by the inquiry. A line of inquiry may yield impeachment; or it may only support the opinion of an opposing expert; it may even involve some objectionable questions, which the judge can then bar individually; but no judge can foresee at the outset what will ultimately emerge. The outcome of a lawyer’s examination of experts on highly technical relevant scientific subjects — such as the cause of death in this case — is therefore incapable of being labeled unfairly prejudicial before the first question is even answered.
Here the trial court improperly used a provision meant to eliminate only legally unreliable evidence to bar what could have been the most relevant and reliable evidence in the case — evidence that lacked any of the factors on which a § 90.403 exclusion could be premised. Ironically the application of § 90.403 in this case had the perverse result of inflicting unfair prejudice on the proponent of the evidence, the plaintiff.
I therefore conclude that this exclusion of a proper line of inquiry in cross examination of defendants’ expert witness requires a new trial. As to the other issues raised on this appeal I would not foreclose the trial judge from revisiting them in a new trial.

. Along with his related corporate entities.

. § 90.402, Fla. Stat. (2009) ("All relevant evidence is admissible, except as provided by law”).

. § 90.401, Fla. Stat. (2009).

.§ 90.705(1), Fla. Stat. (2009) ("On cross-examination the expert shall be required to specify the facts or data”).

. § 90.608(5), Fla. Stat. (2009) ("Any party ... may attack the credibility of a witness by ... proof by other witnesses that material facts are not as testified to by the witness being impeached”).

. Dempsey v. Shell Oil Co., 589 So.2d 373, 377 (Fla. 4th DCA 1991) (relying on C. Eh-rhardt, Florida Evidence 294-5 (2d ed. 1984)).

. Johnston v. State, 863 So.2d 271, 278 (Fla.2003) (trial court’s discretion on admissibility of evidence is limited by the rules of evidence); Reed v. State, 883 So.2d 387 (Fla. 4th DCA 2004) (trial court’s discretion in determining admissibility of evidence is limited by rules of evidence).

.See § 90.403, Fla. Stat. (2009) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice”).

. See Ramirez v. State, 810 So.2d 836, 843 (Fla.2001) ("In applying [§ 90.403], the court bars ... evidence that is unduly prejudicial, misleading, or confusing — i.e., evidence that is 'legally' unreliable”).

. See Brown v. State, 719 So.2d 882, 885 (Fla.1998) (term unfair prejudice in § 90.403 means undue tendency to suggest decision on an improper basis (relying on Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).

. Dr. Jacob Bronowski explained the essence of the scientific method in this way: "ask an impertinent question and you are on the way to a pertinent answer.” The Ascent of Man (episode 4, Fires, Metals and Alchemy).

. § 90.705(1), Fla. Stat. (2009).

. § 90.702, Fla. Stat. (2009) ("If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial”).

. "It is often said in science that theories can never be proved, only disproved.” Frank Wolfs, Introduction to the Scientific Method, University of Rochester, teacher.pas. rochester.edu/PHY_LABS/AppendixE/ AppendixE.html.